**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Fort Myers Division**

CASE NO.

ANDREW L. WOODS,

      Plaintiff,

v.

KIMBERLY J. COMMINS-TZOUMAKAS,
HALL, RENDER, KILLIAN, HEATH & LYMAN, PLLC,
ALLAN SCHWEITZER, BEACH POINT CAPITAL
MANAGEMENT, LP, and WILLIAM R. SPALDING

      Defendants.

_____/

**<u>COMPLAINT</u>**

Plaintiff Andrew L. Woods, by and through undersigned counsel, hereby sues Kimberly J. Commins-Tzoumakas, Hall, Render, Killian, Heath & Lyman, PLLC, Allan Schweitzer, Beach Point Capital Management, LP, and William R. Spalding (collectively the "Defendants") for damages, and in support states as follows:

## I.     Introduction

1.     Kimberly J. Commins-Tzoumakas, Allan Schweitzer, William R. Spalding (collectively the "Individual Defendants"), and other, as of yet, unnamed co-conspirators, for their personal benefit and for the benefit of certain of their employers Defendants, Hall, Render, Killian, Heath & Lyman, PLLC and Beach Point Capital Management, LP (the "Corporate Defendants"), engaged in a tortious and wrongful scheme to maintain control of a vast empire (some have alleged, a criminal enterprise) known as 21st Century Oncology.

1

2.     There were many victims of the wrongful actions of the Individual Defendants and Corporate Defendants, including a Canadian pension fund that lost over $350 million dollars, countless patients (whose rights have been the subject of numerous whistleblower lawsuits and federal investigations), and numerous employees of 21C.  This case is about one such employee who has the wherewithal (and knowledge) to shed light on the Defendants' indefensible acts.

3.     Among the many corrupt acts that the Individual Defendants engaged in for their benefit and the benefit of the Corporate Defendants, but not for the benefit of 21st Century Oncology, was creating false and defamatory reasons to deprive Plaintiff Andrew L. Woods ("Andrew Woods") of amounts already determined to be payable to Andrew Woods as a matter of law pursuant to the express terms of the Amended and Restated Executive Employment Agreement, as amended ("Employment Agreement") between Andrew Woods and Radiation Therapy Services, Inc., d/b/a 21st Century Oncology (hereinafter "21C").

4.     As described below, Defendants' conspiratorial acts were taken for their own benefit, to the detriment of Andrew Woods, and not for the benefit of 21C. Simply put, the Defendants feared that if 21C complied with its legal obligations to pay certain monies to Andrew Woods, the Defendants would lose their control over 21C.   Thus, the Corporate Defendants, by and through the Individual Defendants, created false and defamatory lies about Andrew Woods and caused 21C not to pay Andrew Woods Nine Million Dollars ($9,000,000) pursuant to his Employment Agreement (the "Accrued Compensation").

## II.      The Parties, Jurisdiction, and Venue

5.      Plaintiff Andrew Woods, an individual, is a citizen of the State of Florida and has a residence in Ft. Myers, Florida.

6.      Defendant Kimberly J. Commins-Tzoumakas ("Commins"), an individual, is a citizen of the State of Michigan.

7.      Defendant Hall, Render, Killian, Heath & Lyman, PLLC ("Hall Render"), is a Michigan professional limited liability corporation with its principal place of business in Troy, Michigan.

8.      Defendant Allan Schweitzer, an individual, is a citizen of the State of California.

9.      Defendant Beach Point Capital Management, LP ("Beach Point Capital") is a Delaware limited partnership with its principal place of business in Santa Monica, California.

10.      Defendant William R. Spalding ("Spalding"), an individual, is a citizen of the State of Tennessee.

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of attorneys' fees and costs.

12.      This Court has personal jurisdiction over the Defendants as the acts described below occurred in Ft. Myers, Florida, where 21C is headquartered, and caused Andrew Woods to be damaged in Ft. Myers, Florida.

13.      Venue of this action in this district is proper and appropriate pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions that give rise to this action occurred within this district. Venue is proper in the Fort Myers Division under Local Rule 1.02(b)(5) since Lee County is within the Fort Myers Division.

### III.     Factual Background

**A.  Andrew Woods Is a Well-Respected Advocate for Cancer Care Providers**

14.     Andrew Woods is a native Floridian.

15.     After completing law school, Andrew Woods began representing clients involved in providing cancer care.   While practicing as a lawyer, Andrew Woods expanded his practice to include the representation of clients before governments and government agencies.

16.     Andrew Woods is known as one of the most knowledgeable and respected advocates for cancer care providers.  Many major providers of cancer care have hired him to represent their interests before the federal government.

17.     The American College of Radiation Oncology ("ACRO") is a leading professional society of radiation oncologists.  According to its website, "ACRO strives to ensure the highest quality care for radiation therapy patients and promote success in the practice of radiation oncology through education, responsible socioeconomic advocacy, and integration of science and technology into clinical practice."

18.     Every year, ACRO awards one Gold medal, almost always to a physician in the field, in recognition of that person's contributions to radiation oncology.  In recognition of his advocacy for cancer care providers, in 2007 ACRO awarded Andrew Woods its Gold medal. Andrew Woods is the *only* non-physician ACRO Gold medal winner since the Gold Medal was first awarded in 1995.

**B.  Andrew Woods Provided Invaluable Services to 21C and Was Considered a Logical Choice to Lead the Company as CEO if a Transition was Needed.**

19.     For over twenty-six years, Andrew Woods maintained an ongoing relationship with 21C, providing services vital to its interests.  Eventually, 21C hired Andrew Woods as a senior

executive, but explicitly, in his Employment Agreement, agreed that Andrew Woods could continue to provide services to his other clients.

20.     Over the years, 21C's management and Board of Directors have utilized Andrew Woods, for example, as a federal lobbyist and as a senior company executive, often giving him the most complex and challenging assignments.

21.     For example, in or around 2014, 21C was hit with one of many crippling whistleblower lawsuits alleging illegal acts by 21C physicians.  With regard to this particular whistleblower lawsuit, 21C physicians submitted claims for "FISH" (fluorescence in situ hybridization) genetic tests for bladder cancer that were medically unnecessary.  None of the persons in 21C's management responsible for managing 21C wanted to take on the task of addressing and terminating the principal physician at issue in the case.  Instead, 21C's Board of Directors turned to Andrew Woods to do so because of Andrew Woods well-earned reputation as a problem solver in addition to his general stellar reputation.

22.     Indeed, as a testament to her own confidence in Andrew Woods, Defendant Commins asked Andrew Woods to meet, in his role as an executive and not as an attorney, with the respective U.S. Attorneys conducting the FISH and GAMMA investigations to explain to the U.S. Attorneys the medical rationale for both the FISH test and the GAMMA procedure. Defendant Commins also asked Andrew Woods, again in his role as an executive and not an attorney, to meet with 21C's audit firm, Deloitte, to dispute that firm's opinion that 21C should book $80,000,000 as potential liability for possible illegal GAMMA charges to Medicare. Defendant Commins requested that Andrew Woods find expert legal counsel to rebut Deloitte's position.  At Defendant Commins' direction, Andrew Woods retained the law firm of King & Spalding (defendant William Spalding's former law firm) to provide the relevant opinion.

23.     Because of Andrew Woods' vast knowledge of Medicare reimbursement methodologies for cancer care and his key role in helping shape such methodologies at the federal level, 21C asked Andrew Woods to speak with 21C's most important business partners, including investors, lenders, and physician practices considering joining 21C.  Likewise, 21C routinely asked Andrew Woods to provide his insights to analysts whose reports had a material effect on the market valuations of 21C.

24.     In fact, 21C's Board of Directors, its officers, and its employees often viewed Andrew Woods as the senior executive who acted as 21C's surrogate CEO when 21C's CEO was not available or unable to participate in an event or meeting.  Thus, many considered Andrew Woods as the logical choice to become CEO of 21C if a transition was needed.

### C.  Andrew Woods Successfully Lobbied the Federal Government Regarding Cancer Care Reimbursement Methodologies

25.     As a provider of cancer care and, in particular, radiation therapy, 21C's revenue is intrinsically tied to federal policy decisions made by the United States Congress, the United States Executive branch, and the Centers for Medicare and Medicaid Services ("CMS").

26.     To influence national healthcare policy, including change related to reimbursement of cancer care providers, 21C recognized that such efforts would have a greater chance of success if made by industry trade groups, or many members of the industry, as opposed to a single, small to mid-size healthcare provider based in Southwest Florida, like 21C.   Thus, over many years (including the years applicable to the Employment Agreement), upon 21C's request and with 21C's knowledge and consent, Andrew Woods has simultaneously represented industry groups, 21C, and other members of the industry when lobbying for national health care policies that were aligned with 21C's interests (hereinafter a "National Policy Representation").

27.    For example, in the early 2000s, a technology known as intensity-modulated radiation therapy ("IMRT") emerged as an industry leading treatment.   IMRT uses computer controlled linear accelerators to accurately deliver radiation to a tumor or areas of a tumor, which helps preserve the healthy cells in the vicinity of the cancer from being damaged by the treatment. Initially, CMS had a reimbursement code for IMRT provided in a hospital setting, but no reimbursement code for IMRT provided in a freestanding clinic.   As such, free standing clinics could not get reimbursed from CMS for the provision of IMRT to Medicare beneficiaries.

28.    In accordance with the National Policy Representations strategy outlined above, 21C recognized that Andrew Woods lobbying on behalf of 21C alone, as a single entity based in Southwest Florida, would have very little weight with CMS.   Thus, upon 21C's request and with 21C's knowledge and consent, Andrew Woods represented several industry members, including 21C, before the federal government in an effort to obtain a Medicare reimbursement code for IMRT provided at free standing facilities.

29.    In 2008, at the request of the 21C Board of Directors and its then CEO, Dr. Daniel Dosoretz, Andrew Woods was asked to create and lead the Radiation Therapy Alliance ("RTA"). The RTA was comprised of companies including 21C, and its competitors, among others, Vantage Oncology, Alliance Oncology, OnCure Medical Corporation, Accuray, Physician Oncology Services, Radiation Oncology Services of America, UPMC Cancer Centers, Association of Freestanding Radiation Oncology, C&G Technologies, Inc., McKesson Specialty Health, US Oncology, and Large Urology Group Practice Association.   Thus, it was upon 21C's express direction, with its permission, and with its knowledge that Andrew Woods worked with certain of 21C's competitors listed above.   When concocting the false reasons to terminate Andrew Woods for cause, the Defendants failed to check with the Board members of 21C, failed to check 21C's

corporate records, and failed to check with appropriate 21C personnel, all of which would have confirmed Andrew Woods was supposed to be working with 21C's competitors for the betterment of the industry as a whole directly benefitted 21C.

30.     Andrew Woods faced fierce opposition from hospital-based radiation oncology groups and others who opposed the provision of IMRT at free standing facilities.  Eventually, Andrew Woods' tenacity and perseverance prevailed, and CMS created a reimbursement code and rate for the provision of IMRT at free standing facilities.  It was the first such code issued by CMS for reimbursement of IMRT at free standing facilities.  The result benefited 21C (and other health care providers) and also benefitted patients, who could now choose to receive IMRT at local free-standing facilities instead of in a hospital setting.  Indeed, it was the valuable revenue stream caused by CMS' issuance of this reimbursement code that attracted a private equity firm, Vestar Capital Partners, to invest and take 21C private (from the public market) based on a valuation model reflecting a 21C value of eleven times EBITDA.

### D.  The Defendants Each Had Economic Interests Tied to their Control of 21C

31.     In November 2014, 21C appointed Defendant Commins general counsel of 21C based upon the recommendation of Andrew Woods.  At the time of her appointment, Defendant Commins was as partner at Defendant Hall Render and remained a partner who would provide general counsel services to 21C.  Defendant Commins confided in Andrew Woods that given her then recent financial performance as a partner, she believed she was facing losing her status as an equity partner at Hall Render.  21C became Defendant Commins principal, if not only, client, which she could not afford to lose due to any change in control of 21C.  Thus, Defendant Commins had a significant personal financial interest in retaining her position as General Counsel at 21C and indeed has personally profited by retaining her position at 21C as she currently holds the post

of CEO.

32.     When 21C appointed Defendant Commins general counsel of 21C, Defendant Hall Render gained control, through Defendant Commins, of the legal work requested by 21C to be provided by lawyers and law firms.  Defendant Hall Render obligated 21C to pay it a base annual amount of $4,000,000 and also required 21C to pay additional amounts if certain hourly budgets were exceeded.  21C quickly became Defendant Hall Render's second largest client (and then its largest client when Defendant Hall Render was fired by its then largest client), paying Defendant Hall Render approximately $4.4 million in 2016, approximately $3.8 million in 2017, and almost $3 million in 2018.    Defendant Hall Render could not afford to lose 21C as its principal client due to any change in control of 21C.  Thus, Defendant Hall Render had a significant financial interest in retaining 21C as a client.

33.     Defendant Schweitzer is a financial manager that seeks out and recommends investments to his employer Defendant Beach Point.  In 2015, Defendant Schweitzer and Defendant Beach Point Capital led a group of investors that executed a Credit Agreement with 21C providing loan financing that grew to over $720 million.  Defendant Schweitzer told Andrew Woods his recommendation to Defendant Beach Point Capital and others to put such funds into 21C put his job and financial net worth on the line.  Defendant Schweitzer and Defendant Beach Point Capital sought, and obtained over time, more and more control over 21C.  At the time that Andrew Woods requested payment of his Accrued Compensation, Defendant Schweitzer and Defendant Beach Point Capital stood to lose control over 21C had the payment been paid to Andrew Woods.  Thus, Defendant Schweitzer and Defendant Beach Point Capital had significant financial interests in maintaining their control over 21C.

34.     In early 2016, Defendant William Spalding joined 21C as an advisor and also began

working to assist 21C with its financial matters.   On September 9, 2016, 21C appointed Defendant Spalding CEO and President of 21C.  Pursuant to his employment agreement with 21C, Defendant Spalding would receive significant financial benefits if he remained in his position as CEO. Because payment of the Accrued Compensation to Andrew Woods could have caused the termination of Defendant Spalding, he had a personal interest in causing 21C not to pay Andrew Woods.

### E. Andrew Woods Earned, but was not Paid, $10,000,000 in Accrued Compensation.

35.    On May 13, 2013, 21C executed the Employment Agreement with Andrew Woods. *See* Exhibit 1 hereto.

36.    When drafting the Employment Agreement, 21C set forth three opportunities for Andrew Woods to earn nondiscretionary, incentive bonuses up to $10,000,000.  The Employment Agreement tied the nondiscretionary, incentive bonuses to the achievement of National Policy Representations relating to price stabilization initiatives that benefitted 21C.

37.    In recent bankruptcy filings, 21C has admitted that Andrew Woods is entitled to the  $10,000,000 in Accrued Compensation (subject to bankruptcy law limitations).  Moreover, in January 2016, 21C paid Andrew Woods $1,000,000 of such Accrued Compensation prior to Defendants engaging in their conspiracy to maintain control of 21C for their own financial gain and prevent Andrew Woods from receiving the remaining $9,000,000 in Accrued Compensation. Thus, it is undisputed that Andrew Woods earned and should have been paid the remaining $9,000,000 in Accrued Compensation.

38.    By way of brief background, after several years of hard work, Andrew Woods' efforts were successful, and on December 28, 2015, the United States Congress (through a unanimous vote of 100-0 in the Senate and 435-0 in the House) passed a law that froze reductions

in Medicare reimbursement for freestanding radiation therapy centers.  The freeze provided 21C with a major financial boost, which allowed it to continue to provide cancer treatment to its patients.

39.     After its outside legal counsel and Board of Directors analyzed Andrew Woods' Employment Agreement, 21C agreed that Andrew Woods was legally entitled to a $5,000,000 bonus for the freeze.  21C paid $1,000,000 of the $5,000,000 and later booked an additional $4,000,000 in liabilities associated with the legal obligation to pay Andrew Woods this portion of his Accrued Compensation.

40.     Likewise, Andrew Woods successfully lobbied the United States Department of Health and Human Services ("HHS") to implement a new, multi-bundled payment system for cancer care services, that included reimbursement for freestanding radiation therapy centers.

41.     As a result of Andrew Woods' efforts, he was entitled to two $2.5 million dollar nondiscretionary bonuses pursuant to the terms of his Employment Agreement.  The then CEO, Dr. Daniel Dosoretz, confirmed to Andrew Woods that he was entitled to the two $2.5 million dollar bonuses, and 21C in recent bankruptcy court filings has also conceded that Andrew Woods is entitled to such bonuses (subject to bankruptcy law limitations).

42.     The remaining $4,000,000 nondiscretionary bonus associated with the freeze and the two $2.5 million-dollar bonuses associated with the multi-bundled payment system comprise the $9,000,000 of Accrued Compensation owed to Andrew Woods in 2016.

43.     As explained below, each of the Defendants feared that if 21C paid Andrew Woods his lawfully earned monies, by operation of certain agreements with 21C investors (explained in greater detail below), they would lose their positions and control of 21C and Andrew Woods would

then leverage the $9,000,000 owed to him along with his knowledge of the industry and of 21C to become the next CEO of 21C.

**F.  Certain Relevant Investments in 21C**

44.     Although Andrew Woods' excellent performance provided needed revenue stability, 21C's rapid expansion, Medicare fraud settlements, and other ventures caused 21C to suffer financial distress as it attempted to make required debt payments.

45.     Thus, during certain periods, 21C asked Andrew Woods to assist it with obtaining financing for 21C.  In this role, Andrew Woods learned that if 21C were to default on certain of its obligations to banks, lenders, and/or other creditors, some of such entities had substantial legal rights to force changes at 21C, including changes in management that would have cost the Individual Defendants their jobs.

46.     By way of example, in September 2014, 21C entered into a Subscription Agreement, and other documentation, with the Canada Pension Plan Investment Board ("CPPIB") pursuant to which the CPPIB purchased $325 million worth of Series A Preferred Stock.  The Subscription Agreement and other relevant documentation signed as part of such investment provided CPPIB with significant rights that would arise upon a Default Event.  Default Events included breaches with respect to any item of indebtedness with principal of $5 million or more that would permit the holders of such indebtedness to declare the entire indebtedness due and payable.  Several of the holders of such indebtedness had liquidity clauses that required 21C to maintain a certain amount of liquid cash on hand.

47.     The CPPIB's rights in the event of a Default Event included, without limitation, the right to (i) exchange their Series A Convertible Preferred Stock for an unsecured promissory note; (ii) cause 21C to repurchase their Series A Convertible Preferred Stock by requiring 21C to issue

a Sale Notice to consummate a sale of 21C within six months; and (iii) nominate a majority of the members of the Board of Directors of 21C, its subsidiaries, and all of the committees thereof.

48.     Thus, CPPIB, by way of example, had the right to take control of the Board of 21C and/or force the sale of 21C in the event of a Default Event, which would effectively provide CPPIB will full control over 21C and cause the Individual Defendants to lose their jobs.

49.     In April 2015, Defendant Schweitzer and Defendant Beach Point Capital led a group of investors that executed a Credit Agreement with 21C providing loan financing that grew to over $720 million.  Although  Defendant Schweitzer was not appointed to the 21C Board of Directors, his group was permitted to appoint an observer to the Board of Directors and such observer reported to Defendant Schweitzer.

50.     Between 2015 and 2016, other parties, including banks, provided working capital to 21C.  Each of the documents executed as part of such financings contained events of default, which if triggered would constitute an Event of Default giving, by way of example, CPPIB the right to take control of 21C and cause the Individual Defendants to lose their jobs.

51.     By 2016, however, despite the revenue stability that Andrew Woods had brought to 21C, the company was having some financial difficulties.  Defendant Schweitzer confided in Andrew Woods that Defendant Schweitzer was personally worried about CPPIB exercising its rights, including its rights to take over 21C, as such action would cause Defendant Schweitzer and Defendant Beach Point Capital severe financial repercussions.

52.     Defendant Schweitzer confided in Andrew Woods that his personal reputation and career would be severely affected if 21C was taken over by CPPIB or others, and that Defendant Schweitzer and Defendant Beach Point Capital could not personally afford losing control of 21C to, by way of example, CPPIB or others as doing so would cost Defendant Schweitzer his job and

significant wealth and would cause Defendant Beach Point Capital to suffer significant financial loss.

53.    In May 2016, holders of certain Senior Notes issued a notice that if 21C did not provide its 2015 year-end financial statements within 60 days, they would declare 21C in default, which would have triggered numerous cross-defaults, including an Event of Default pursuant to CPPIB's Subscription Agreement and related documentation.

54.    Because a default would have given, by way of example, CPPIB the right to take control of 21C, Defendant Schweitzer coordinated discussions by and between Defendant Spalding, Defendant Commins, Defendant Hall Render, and Defendant Beach Point Capital and the various holders of debt resulting in the execution of multiple agreements over the next few months that avoided 21C being declared in default under its applicable agreements.  One of such agreements is known as the August 2016 Amendments.

55.    The so-called August 2016 Amendments to the various debt agreements by and between the various creditors again agreed to waive any defaults, so as not to trigger certain rights, including CPPIB's rights, and further established certain fundraising and other milestones including, without limitation, requiring (i) 21C to raise $25 million by September 30, 2016; (ii) 21C to raise an additional $25 million by November 30, 2016; and (iii) 21C to raise additional funds by March 31, 2017.

56.    21C raised the first $25 million from CPPIB.  On or about September 9, 2016, CPPIB entered into a Second Subscription Agreement, and other documents, with 21C pursuant to which CPPIB paid $25 million for another 25,000 shares of Series A Preferred Stock.  Within

such documentation, CPPIB waived any and all prior events of default that could have given rise to a Default Event.

57.     As described more fully below, after raising $25 million from CPPIB on September 9, 2016, the Defendants learned on or about September 27, 2016 that 21C owed Andrew Woods the sum of Nine Million dollars in Accrued Compensation and at least another one million in severance.  The Defendants caused 21C to hide this fact, and not disclose this fact, in 21C's public filings or otherwise.  The Defendants believed that payment of such Accrued Compensation to Andrew Woods would have been to the personal detriment of each of the Defendants as they each feared that such payment would have caused them to lose control of 21C.  In sum, to keep their jobs, the Individual Defendants concealed from those outside 21C that 21C legally owed Woods this nondiscretionary bonuses totaling $9,000,000.  Defendants also feared that Andrew Woods would leverage the $9,000,000 owed to him along with his knowledge of the industry and of 21C to become the next CEO of 21C, causing each of them to lose their control over 21C.

58.     Thus, Defendants acted in their own interests, and not in the interests of 21C, and engaged in a conspiracy by concocting false and defamatory reasons why Andrew Woods was not entitled to his Accrued Compensation and that he should be terminated "for cause."  On the other hand, payment of the Accrued Compensation to Andrew Woods was in the interests of 21C as the money was owed by 21C (as it has admitted), certain of 21C's creditors could have then taken control of 21C and either sold it for a healthy profit or made changes to the company and turned it around.  The failure to pay also embroiled 21C in litigation with Andrew Woods, who was forced

to bring suit and litigate the patently frivolous defenses 21C advanced at the hands of the Individual Defendants.

### G. The Formation of a Conspiracy between the Defendants to Protect their Personal Interests.

59.     Defendant Commins conspired with the other Defendants for her personal benefit and to the detriment of 21C.  As the general counsel, she had interactions with each of them regarding all material legal issues facing 21C.  She coordinated the termination of Andrew Woods first without cause and then after learning about the Accrued Compensation that was due, coordinated the creation of the false and defamatory reasons to terminate Andrew Woods "with cause."

60.     On September 23, 2016, 21C informed Andrew Woods that he was being terminated **without cause**.  The same day, Defendant Commins called Andrew Woods to ask how he was doing.  Andrew Woods responded that he was fine and noted for Defendant Commins that pursuant to the plain terms of his, 21C was obligated to pay Andrew Woods the full Nine Million in Accrued Compensation.  Defendant Commins informed Andrew Woods that she was not aware of such obligation and seemed surprised and shocked that 21C would have to immediately pay Andrew Woods such sum.

61.     Defendant Commins asked Andrew Woods to put his request in writing so that she could discuss it with others, which she led Andrew Woods to believe included Defendant Spalding, and Defendant Schweitzer.

62.     On September 27, 2016, Andrew Woods sent an email attaching a letter itemizing the bonuses due to him pursuant to his Employment Agreement.  *See* Exhibit 2.  In the September 27, 2016 letter, Andrew Woods explained that his incentive bonuses (with a balance due of nine million dollars) were immediately due and payable pursuant to his Employment Agreement and

asked that the Accrued Compensation be paid "as soon as practicable."  Andrew Woods' request that the Accrued Compensation be paid "as soon as practicable" is illustrative of Andrew Woods acting in the best interests of 21C.

63.    After receiving Andrew Woods' September 27, 2016 letter, Defendant Commins on her behalf and on behalf of Defendant Hall Render discussed with Defendant Schweitzer, on his behalf and on behalf of Defendant Beach Point Capital, and Defendant Spalding how to prevent 21C from paying Andrew Woods his accrued compensation.  Together the Defendants agreed to manufacture a false and defamatory "for cause" reason to terminate Andrew Woods.

64.    Almost three weeks after sending his September 27, 2016 letter, on October 14, 2016 Andrew Woods received a response from a law firm representing 21C.  *See* Exhibit 3.   The letter was the direct result of the Defendants' conspiracy set forth above.

65.    In an obvious attempt to deny Andrew Woods the contractual payments he earned, Defendants provided the law firm with a fabricated excuse to avoid any further payment to him. After years of obtaining incredible results for 21C, Defendants, without any basis, attempted to retroactively "convert" Andrew Woods' termination without cause to a termination "for cause," without any factual basis as evidenced by 21C's inability to provide any supporting evidence in either a federal district court or bankruptcy court proceeding, which eventually forced 21C to withdraw such allegations in the bankruptcy court.

66.    The "fabrication" changed on several occasions as undisputed facts were uncovered that utterly eviscerated the Defendants' false termination of Andrew Woods "for cause" in furtherance of their conspiracy.  First, the Individual Defendants asserted that Andrew Woods had breached his Employment Agreement by also providing services to the H. Lee Moffit Cancer Center. After raising this false excuse, the Individual Defendants learned that 21C had full

knowledge that H. Lee Moffit Cancer Center was a client of Andrew Woods and that the then CEO of 21C, and others, had asked Andrew Woods to use his connections at his client H. Lee Moffit Cancer Center to set up meetings between the two companies.

67.     When the Defendants' fabricated "for cause" excuse based on Andrew Woods' work for H. Lee Moffit Cancer fell part, the Defendants created a new "for cause" excuse.  Next, the Defendants claimed that Andrew Woods had breached his Employment Agreement by also providing services to U.S. Oncology.  Once again, after raising this false excuse, the Defendants learned that 21C had full knowledge that U.S. Oncology was a client of Andrew Woods and that the then CEO of 21C, and others, had asked Andrew Woods to use his connections at his client U.S. Oncology set up meetings between the two companies.  In fact, for many years before he became employed by 21C, Andrew Woods had registered as a lobbyist for U.S. Oncology pursuant to the requirements of the Federal Lobbying Disclosure Act.

**H. The Defendants Conspired to Deny Andrew Woods his Compensation in Order to Maintain their Control over 21C for their own Financial Benefit.**

68.     The Defendants' decision not to pay Andrew Woods his Accrued Compensation was not made for the benefit of 21C.  In its books and records, 21C had already accrued $4,000,000 of the Accrued Compensation, then CEO Dr. Dosoretz had informed Andrew Woods that he was entitled to the full Nine Million in Accrued Compensation, and based on 21C's representations to the bankruptcy court, such court has determined that Andrew Woods is entitled to the Accrued Compensation (although in bankruptcy such Accrued Compensation would be reduced by certain bankruptcy statutes and converted to worthless common shares).

69.     Each of the Defendants feared that Andrew Woods would not negotiate and would expect to be immediately paid, in a lump sum, the full Nine Million in Accrued Compensation, which they surmised would cause a default under numerous credit agreements and which would,

in turn, cause each of the Defendants to lose the financial benefits that they were obtaining from 21C and hoped to obtain from 21C. Moreover, each of the Defendants feared that Andrew Woods would leverage the $9,000,000 owed to him along with his knowledge of the industry and of 21C to become the next CEO of 21C.

70.     Instead of attempting to negotiate with Andrew Woods or negotiate with CPPIB and/or with 21C's creditors, as they had done successfully on numerous occasions, to reach agreement that a default had not occurred, Defendants conspired to prevent 21C from paying Andrew Woods his Accrued Compensation and to prevent him from being considered for the position of CEO by falsely claiming that he had been terminated for cause when the books and records of 21C showed that it had already accrued $4,000,000 of the Accrued Compensation and the books and records of 21C contained no evidence of any reason to terminate Andrew Woods for cause.

71.     By creating false reasons why Andrew Woods should have been terminated for cause, Defendants prevented Andrew Woods from receiving his Accrued Compensation. As a result, each of the Defendants continued to receive significant personal benefits resulting from not losing control of 21C.

72.     Defendants Schweitzer, Beach Point, Commins, and Hall Render have maintained their control even through the bankruptcy of 21C. By way of example, the Defendants prepared a prepackaged  bankruptcy plan, which they submitted to the bankruptcy court and to the creditors. A material portion of the 21C's projected revenue stream set forth in the prepackaged bankruptcy plan was dependent on the continued support of two large physician practices: (i) South Florida Radiation Oncology ("SFRO"), led by Mr. Patel; and Florida Oncology Partners, LLC, led by Dr. Gold. Fearing that SFRO and Florida Oncology Partners would take actions to move their patients

away from 21C and to otherwise object to Defendants' prepackaged bankruptcy plan, certain of the Defendants conspired to arrange for surreptitious payments to be made to both groups.

73.     Mr. Patel and Florida Oncology Partners were also significant creditors of 21C, whose claims were supposed to be addressed in the same manner as the claims of all other creditors within their creditor class.  Mr. Patel individually had a claim of approximately $2.5 million filed with the bankruptcy court and also owned an interest in and controlled the Seema Dass 2014 Grat, which had a claim of approximately $5.7 million filed with the bankruptcy court.  Florida Oncology Partners, LLC filed a claim with the bankruptcy court for approximately $2.5 million.

74.     According to the bankruptcy court records of the votes regarding the prepackaged bankruptcy plan recorded by various creditors as of the voting deadline of November 27, 2017, Florida Oncology Partners, LLC voted to reject the plan [Bankr. D.E. 865, at p. 20 of 28],  Mr. Patel voted to reject the plan [Bankr. D.E. 865, at p. 22 of 28], and the Seema Dass 2014 Grat voted to reject the plan [Bankr. D.E. 865, at p. 23 of 28].

75.     In furtherance of their scheme of maintaining control of 21C, Defendants arranged for Mr. Patel and his group to receive a $5,000,000 payment from a 21C subsidiary (also within the bankruptcy estate), which subsidiary was then reimbursed by 21C as part of an "operating expense."  If 21C had made a direct payment to Mr. Patel and his group such transaction would have been scrutinized.  On January 8, 2018, the day before the bankruptcy court's consideration and approval of the plan, Mr. Patel and the Seema Dass 2014 Grat withdrew their objection to the plan [Bankr. D.E. 892].  Such payment to Mr. Patel and his group was not made for the benefit of 21C, but instead was made in furtherance of the conspiracy by Defendant Schweitzer and Defendant Commins to maintain control over 21C.

76.     Defendants also surreptitiously arranged for Florida Oncology Partners, LLC to receive $2,000,000 to induce it to keep its patients within the 21C system.  Such payment to a creditor was not properly disclosed to interested parties to the bankruptcy court.

77.     All conditions precedent to the filing of each count in this action has been met, excused, or waived.

## IV.     Causes of Action

### Count I – Tortious Interference with Contract
### (against all Defendants)

78.     Andrew Woods hereby incorporates paragraph 1 through 77 as if fully set forth herein.

79.     At all relevant times, Andrew Woods was a party to the Employment Agreement with 21C.

80.     Pursuant to the terms of the Employment Agreement, in September 2016, 21C was obligated to pay Andrew Woods the Accrued Compensation.

81.     Each of the Defendants had knowledge of the existence of the Employment Agreement and of 21C's obligation to pay Andrew Woods the Accrued Compensation.

82.     Each of the Defendants intentionally and without justification interfered with Andrew Woods' contractual right to receive the Accrued Compensation by fabricating a "termination for cause" of Andrew Woods' Employment Agreement.  Moreover, in fabricating such "termination for cause" each of the Defendants acted solely with ulterior purposes to personally benefit themselves, without an honest belief that such "termination for cause" would benefit 21C, and, indeed, against the best interests of 21C.

83.     As a result of the tortious acts of Defendants, Andrew Woods has been damaged.

84.     Andrew Woods has otherwise complied with all conditions precedent to bringing this claim, or they have been waived.

WHEREFORE Plaintiff Andrew Woods requests that a judgment be entered in his favor and jointly and severally against Defendant Schweitzer, Defendant Spalding, Defendant Commins, Defendant Hall Render, and Defendant Beach Point for damages, pre-judgment interest, post-judgment interest, and attorneys' fees and costs pursuant to Section 448.08, Florida Statutes.

### Count II – Civil Conspiracy
### (against all Defendants)

85.     Andrew Woods hereby incorporates paragraph 1 through 77  as if fully set forth herein.

86.     At all relevant times, Andrew Woods was a party to the Employment Agreement with 21C.

87.     Pursuant to the terms of the Employment Agreement, in September 2016, 21C was obligated to pay Andrew Woods the Accrued Compensation.

88.     Each of the Defendants had knowledge of the existence of the Employment Agreement and of 21C's obligation to pay Andrew Woods the Accrued Compensation.

89.     Each of the Defendants intentionally and without justification acting in concert on behalf of themselves, individually, reached an agreement to interfere with Andrew Woods' contractual right to receive the Accrued Compensation by fabricating a "termination for cause" of Andrew Woods' Employment Agreement.  This agreement was unlawful as it tortuously interfered with Andrew Woods' rights under this Employment Agreement.

90.     Moreover, in conspiring to fabricate such "termination for cause" each of the Defendants acted solely with ulterior purposes to benefit themselves, without an honest belief that such "termination for cause" would benefit 21C, and, acted against the best interests of 21C.  Had

each of the Defendants been acting in the best interests of 21C, they would have negotiated with Andrew Woods or negotiated with CPPIB and other stakeholders, as they had successfully done numerous times in the past, to reach an agreement that the payment to Andrew Woods would not be considered a default under any loan documents.

91.     It is by reason of their combination and actions in concert that 21C failed to pay Andrew Woods his Accrued Compensation because had any one of the Defendants acted in accordance with the true facts and the plain terms of the Employment Agreement, 21C would have paid Andrew Woods his Accrued Compensation.  It is only because the then CEO, General Counsel, outside law firm, and outside investor conspired, for their benefit, to prevent the payment of the Accrued Compensation that 21C failed to pay such Accrued Compensation to Andrew Woods.

92.     As a result of the tortious acts of Defendants, Andrew Woods has been damaged.

93.     Andrew Woods has otherwise complied with all conditions precedent to bringing this claim, or they have been waived.

WHEREFORE Plaintiff Andrew Woods requests that a judgment be entered in his favor and jointly and severally against Defendant Schweitzer, Defendant Spalding, Defendant Commins, Defendant Hall Render, and Defendant Beach Point Capital for damages, pre-judgment interest, post-judgment interest, and attorneys' fees and costs pursuant to Section 448.08, Florida Statutes.

### Count III – Vicarious Liability
### (against the Corporate Defendants)

94.     Andrew Woods hereby incorporates paragraph 1 through 77 as if fully set forth herein.

95.     At all relevant times, Andrew Woods was a party to the Employment Agreement with 21C.

96.     At all relevant times, Defendant Schweitzer was an employee and agent of Defendant Beach Point Capital.

97.     At all relevant times, Defendant Commins was a partner in and agent of Defendant Hall Render.

98.     In taking the actions described in paragraphs 31 through 34 and  43 through 76, Defendant Schweitzer was acting to further the interests of Defendant Beach Point Capital.

99.     In taking the actions described in paragraphs 31 through 34 and 43 through 76, Defendant Schweitzer took actions of the kind he is required to perform by Defendant Beach Point Capital to protect its interests.

100.    In taking the actions described in paragraphs 31 through 34 and 43 through 76, Defendant Schweitzer took actions substantially within the time and space limits of his employment by Defendant Beach Point Capital.

101.    In taking the actions described in paragraphs 31 through 34 and 43 through 76, Defendant Schweitzer was motivated, in part, by a purpose to serve the interests of  Defendant Beach Point Capital.

102.    In taking the actions described in paragraphs 31 through 34 and 43 through 76, Defendant Commins was acting to further the interests of Defendant Hall Render.

103.    In taking the actions described in paragraphs 31 through 34 and 43 through 76, Defendant Commins took actions of the kind she is required to perform by Defendant Hall Render to protect its interests.

104.    In taking the actions described in paragraphs 31 through 34 and 43 through 76, Defendant Commins took actions substantially within the time and space limits of her employment, partnership, and agency by Defendant Hall Render.

105.    In taking the actions described in paragraphs 31 through 34 and 43 through 76, Defendant Commins was motivated, in part, by a purpose to serve the interests of Defendant Hall Render.

106.    As a result of the acts of Defendants Schweitzer and Commins, Andrew Woods has been damaged.

107.    Defendants Beach Point Capital and Hall Render are vicariously liable for the respective actions of Defendants Schweitzer and Commins.

WHEREFORE Plaintiff Andrew Woods requests that a judgment be entered in his favor and against Defendant Hall Render and Defendant Beach Point Capital for damages, pre-judgment interest, post-judgment interest, and attorneys' fees and costs pursuant to Section 448.08, Florida Statutes.

## DEMAND FOR JURY

Plaintiff Andrew Woods hereby demands a trial by jury for all issues so triable.


Respectfully submitted,

**ZUMPANO PATRICIOS, P.A.**

312 Minorca Ave.
Coral Gables, FL 33134
Tel: 305-444-5565
Email: lpatricios@zplaw.com

By:    */s/ Leon N. Patricios*
       Leon N. Patricios
       Fla. Bar No.   0012777

**YORMAK EMPLOYMENT AND DISABILITY LAW**

9990 Coconut Road
Bonita Springs, FL 34135
Tel: 239-985-9691
Email: byormak@yormaklaw.com

By:    *Benjamin H. Yormak*
       Benjamin H. Yormak
       Fla. Bar No. 71272